Rel: July 25, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2025

———————————————

### CL-2024-0704

———————————————

## John Edward Bryson, Jr.

### v.

## Brenda Mae Bryson

**Appeal from Madison Circuit Court**
**(DR-16-490.02)**

On Application for Rehearing

EDWARDS, Judge.

This court's opinion released on May 23, 2025, is withdrawn, and the following is substituted therefor.

John Edward Bryson, Jr. ("the former husband"), and Brenda Mae Bryson ("the former wife") were divorced by the Madison Circuit Court ("the trial court") in a September 2017 judgment ("the divorce judgment"). In the divorce judgment, the trial court ordered that, beginning in October 2017, the former husband would pay to the former wife $400 per month as periodic alimony and $500 per month as child support for the parties' minor child.[1] In February 2019, the parties again appeared before the trial court due to "a dispute between the parties regarding monies due and owed by the [former husband]." In a June 2019 order, the trial court determined that the former husband owed to the former wife $7,155.94 and required that the former husband pay the former wife $1,427.97 in a lump sum and the remaining $5,727.97 at a rate of $500 per month until the remainder was paid in full. The trial court further noted that "[s]aid sums shall be paid in addition to the alimony currently paid by the [former husband] to the [former wife]." The June 2019 order does not disclose whether the $7,155.94 owed to the

---

[1]The parties' minor child was born on July 30, 1999, and reached the age of majority in 2018.

2

former wife was an alimony arrearage, a child-support arrearage, or a combination of the two.

In August 2019, the trial court entered an order amending its June 2019 order. Pursuant to the August 2019 order, the former husband was to pay the former wife $500 per month until the $5,727.97 arrearage balance (sometimes referred to as "the 2019 arrearage amount") was retired. Additionally, the trial court recognized that the former husband was paying the former wife $461 per month pursuant to an existing income-withholding order[2] and ordered that that income-withholding order was to remain in effect until the 2019 arrearage amount was paid in full, at which time the former husband would resume making periodic-alimony payments of $400 per month.

In November 2023, the former wife filed in the trial court a petition seeking to have the former husband held in contempt, alleging that the former husband had failed to make 8 of his 12 monthly alimony payments

---

[2]In a December 2017 order on a motion to alter, amend, or vacate the divorce judgment, the trial court noted that it had issued an income-withholding order in November 2017; the income-withholding order does not appear in the record. The record provides that the withholding was satisfied by two withholdings per month of $230.77 per paycheck.

3

in 2023.[3] The trial court later permitted the former wife to amend her petition to include an allegation that the former husband had not paid alimony between the months of January 2024 and April 2024. The former husband filed an answer and asserted a counterclaim seeking to terminate his alimony obligation because, he said, he was fully disabled and the former wife had "experienced increased success from her employment" as a real-estate agent. He acknowledged that he had failed to make the required monthly alimony payments in 2023 but stated that he had done so "without a contemptuous heart" and that he had been unable to make the required alimony payments because he was disabled.

At the trial, which was commenced on April 12, 2024, and was concluded on June 20, 2024 ("the April 2024 trial date" and "the June 2024 trial date," respectively), the former wife, appearing pro se, alleged that, as of the April 2024 trial date, the former husband had failed to make 6 alimony payments in 2021, 5 alimony payments in 2022, 8 alimony payments in 2023, and 4 alimony payments in 2024, for a total

---

[3]Although the former wife filed the contempt petition in November 2023, she alleged that the former husband did not make an alimony payment in December 2023.

of 23 delinquent alimony payments.[4] She also testified that the former

husband still owed to her $3,210.28 of the 2019 arrearage amount. The

former wife agreed with the trial court's calculation and stated that she

was seeking an alimony arrearage of $12,410.28, plus an unspecified

amount in statutory interest. Based on the record, the total amount of

$12,410.28 was comprised of $9,200, representing the 23 allegedly

delinquent $400 monthly alimony payments, and the $3,210.28 that the

former wife claimed that the former husband still owed her of the 2019

arrearage amount. The trial court, over the objections of the former

husband's attorney, permitted the former wife to present evidence and

arguments regarding the outstanding $3,210.28, despite that amount

not being referenced in the former wife's petition for contempt because,

according to the trial court, the former wife's petition "just [said] failure

to pay alimony in certain places." Between the April 2024 trial date and

the June 2024 trial date, the former husband paid the former wife $5,000.

---

[4]The former wife stated at trial that the former husband had failed
to make his alimony payments in January, April, July, August,
September, October, November, and December in 2023 and in January,
February, March, and April in 2024. The former husband presented
evidence indicating that he had not made alimony payments in January,
February, March, November, and December 2022.

The former wife acknowledged on the June 2024 trial date that, based on the former husband's $5,000 payment, she was seeking $7,410 as arrearages plus unspecified interest from the former husband.

The former wife testified that she had been employed as a real-estate agent since 2017 and had been employed at Smith Douglas Homes since August 2022. She testified that she had earned approximately $19,000 in 2021 and that her income for 2023 was approximately $133,492.[5] She testified that, in addition to a salary, she was paid 1.25% of her sales as a commission.[6] She also testified that at the time of the April 2024 trial date, she had sold approximately six houses, had four houses pending sale, and had eight houses currently listed for sale. She further testified that her monthly expenses were approximately $16,000 per month. She testified that that amount included approximately $4,000 per month for work-related travel expenses, $300 per month for tutoring for at least one child that she had fostered or adopted since the

---

[5]She testified that she had not had an income at the time of the parties' divorce. There is no indication of what the former wife's income was in 2022.

[6]It appears that the former wife's base salary was approximately $3,000 per month.

September 2017 divorce, and $1,240 per month for childcare for her grandchildren. The former wife indicated that she was also making payments toward several debts that remained from the parties' divorce that the former wife testified totaled approximately $12,000 in January 2024; however, she offered no evidence to support that assertion.[7] She also acknowledged that she likely donated "thousands of dollars to charities."

The former husband testified that he had served in the military for approximately nine years, and, thus, was not eligible for military-retirement pay; he had been honorably discharged in August 2005. He testified that he had suffered a non-combat related spinal injury when he had been deployed to Qatar. The former husband testified that he had worked for the United States Army Corps of Engineers after he was discharged from military service and that, pursuant to an income-withholding order, approximately $461 per month had been withheld by his employer to pay his monthly child-support obligation to the former

---

[7]The September 2017 divorce judgment provides the various debts each party was to assume from the marriage.

wife.[8]  Based on the information contained in the record, those payments had been withheld monthly from January 2018 to November 2021.  The former husband explained that, although the income-withholding order had been instituted to pay his child-support obligation, he had not sought to cancel the income-withholding order after the parties' child reached the age of majority in July 2018.  He said that, instead, he had considered the payments made to the former wife pursuant to the income-withholding order after July 2018 to have fulfilled his monthly alimony obligation until he had become unemployed in November 2021.

The former husband testified that he lost his employment with the Army Corps of Engineers in November 2021 because he was disabled and because his position "went away."  The former husband testified that he had pursued a disability claim sometime after losing his job with the Army Corps of Engineers.  However, he also testified that, at the time of his discharge from military service, he had qualified for 10% disability

---

[8]The record contains several exhibits with overlapping exhibit numbers.  The former husband introduced as "Defendant's Exhibit 2" the former wife's monthly budget.  Later in the proceedings, the former husband introduced, also as "Defendant's Exhibit 2," a list of disbursements demonstrating "[p]roof of his payments pursuant to the [income-]withholding order."

through the United States Department of Veterans Affairs ("VA"). According to the record, the former husband qualified for 100% VA disability in June 2020, and he began receiving approximately $3,566 per month in VA disability benefits shortly thereafter. The former husband testified that he had obtained full-time employment as a security guard with D.E.S. Garrison ("D.E.S.") in April 2024; he testified that he earns approximately $59,642 annually through his employment with D.E.S. The former husband testified that D.E.S. pays him biweekly and that he has an "allotment" through D.E.S. that directly deposits $200 per paycheck into the former wife's bank account.

The former husband testified that he and his current wife, Sharon Bryson ("the current wife"), purchased a home in May 2023 for $650,000 and had used his VA benefits to secure a home loan for the property. According to the current wife, she and the former husband were both listed on the deed to the new home and the accompanying mortgage and note. She testified that she had paid the $5,000 down payment for the house and that the loan originated with the VA. The former husband and the current wife testified that they allowed the current wife's daughter

9

to reside in their former home and that the current wife's daughter paid the mortgage and utilities associated with that property.

The current wife testified that the monthly mortgage payment for the new home was approximately $4,700 per month. She testified that the former husband contributed $2,500 to $2,700 each month from his VA disability benefit toward the mortgage payment. The current wife also testified that the former husband was responsible for paying the loan and insurance associated with his automobile. The former husband testified that he had a 2007 Dodge truck and that the loan on that truck had a balance of $4,000.

The former wife presented evidence indicating that the former husband and the current wife had taken trips to Jamaica, Bhutan, and Mexico over the course of their marriage. The current wife acknowledged those trips and testified that she had paid for the trips herself. The trial court also questioned the current wife and the former husband on the value of the rings that they wore to trial. The trial court noted that it was asking those questions because the former wife had been questioned by the former husband's counsel about the brand of shoes that she had worn to trial.

The trial court entered a judgment in August 2024, finding the former husband guilty of 22 counts of criminal contempt for failing to make alimony payments for 6 months in 2021, 5 months in 2022, 8 months in 2023, and 3 months in 2024. The trial court sentenced the former husband to serve 5 days in the Madison County Jail for each count, for a total of 110 days of incarceration. In the same order, the trial court also found that the former husband owed the former wife "$7,410 in alimony arrearages as of June 20, 2024," reduced that amount "to a judgment in favor of the [former wife] and against the [former husband], for which execution may issue," and stated that "[i]nterest shall accrue on said judgment at the statutory rate." The trial court also denied the former husband's request that his alimony obligation be terminated.[9] The former husband timely appealed without having filed a postjudgment motion. The trial court, over the objection of the former wife, granted the former husband's motion to stay the execution of the contempt sentence pending his appeal.

---

[9]We note that the former wife has not appealed the trial court's failure to include interest on the past-due alimony. See Glover v. Glover, 730 So. 2d 218 (Ala. Civ. App. 1998).

On appeal, the former husband argues that the trial court was biased in favor of the former wife, that the trial court denied him due process by finding him guilty of 22 counts of criminal contempt, that the trial court's finding of criminal contempt was not supported by the evidence, that the 110-day sentence imposed by the trial court was excessive, and that he had sufficiently demonstrated that his alimony obligation to the former wife should have been terminated. We first consider the former husband's argument that the trial court exhibited bias against him. The former husband asserts that the trial court "behaved as an attorney" for the former wife and that, in doing so, it violated Canons 2.A. and 3.A.(3), Canons of Judicial Ethics. He further claims that the trial court asked the current wife an improper number of questions and made "sarcastic and undignified" remarks in response to her answers; he also takes umbrage with the trial court's questioning related to his tax history, including questions related to how the former husband and the current wife obtained a VA loan. In addition, the former husband contends that the trial court improperly relied on the former wife as an "expert" in real-estate transactions by asking, based on her "practice and experience" as a real-estate agent, whether the former

12

husband had to file taxes to obtain a VA loan. Finally, the former husband argues that the trial court expressed clear bias by stating, at the outset of the trial, that, if the former husband had not paid the former wife and he had had the ability to do so, he would go to jail. However, the former husband did not raise an objection at trial contending that the trial court was biased; nor did he file a motion for recusal or a postjudgment motion asserting that the trial court was biased against him. Therefore, the former husband failed to preserve this issue for appellate review. Shiver v. Butler Cnty. Bd. of Educ., 797 So. 2d 1086, 1088 (Ala. Civ. App. 2000) ("Generally, a reviewing court cannot consider arguments made for the first time on appeal.").

We similarly reject the former husband's argument that we should reverse the trial court's judgment insofar as it denied his counterclaim requesting the termination of his alimony obligation. Specifically, the former husband argues that the former wife's increased income warrants a termination in his alimony obligation. However, the trial court did not make specific factual findings in its judgment concerning the denial of the former husband's counterclaim and the former husband's argument

challenges the sufficiency and weight of the evidence. Our supreme court has held that,

> "in a nonjury case in which the trial court makes no specific findings of fact, a party must move for a new trial or otherwise properly raise before the trial court the question relating to the sufficiency or weight of the evidence in order to preserve that question for appellate review."

New Props., L.L.C. v. Stewart, 905 So. 2d 797, 801-02 (Ala. 2004). The former husband failed to file a postjudgment motion challenging the sufficiency or weight of the evidence. Therefore, we must affirm the trial court's judgment as to this issue.

We next consider whether the trial court denied the former husband due process during the contempt proceeding by permitting the former wife to present evidence of past-due alimony payments other than those due in the specific months enumerated in her petition, as amended. The August 2024 order finds the former husband to be in constructive criminal contempt. See Rule 70A(a)(2), Ala. R. Civ. P., (defining "direct contempt" as contemptuous behavior committed in open court and "constructive contempt" as any civil or criminal contempt other than a direct contempt); see also Gladden, 942 So. 2d at 370-71 (concluding that a sentence imposing a definitive term of imprisonment of five days, as

14

opposed to an the imposition of an indefinite term of imprisonment lasting only until the contemnor paid his alimony arrearage, constituted a judgment of criminal contempt). Rule 70A(c)(1), Ala. R. Civ. P., provides that

> "[a] proceeding based on constructive contempt, whether criminal or civil, shall be subject to the rules of civil procedure. The proceeding shall be initiated by the filing of a petition seeking a finding of contempt (the petition may be in the form of a counterclaim or cross-claim authorized under Rule 13[, Ala. R. Civ. P.]). <u>The petition shall provide the alleged contemnor with notice of the essential facts constituting the alleged contemptuous conduct</u>."

(Emphasis added.) Additionally,

> "[i]n considering whether a lower court complied with the requirements of due process in a case of constructive or indirect contempt, we look to determine if the following elements were present: (1) notice of the charges; (2) reasonable opportunity to meet them; (3) right to call witnesses; (4) right to confront the accuser; (5) right to give testimony relevant either to the issue of complete exculpation or extenuation of the offense; and (6) right to offer evidence in mitigation of the penalty imposed."

<u>Fludd v. Gibbs</u>, 817 So. 2d 711, 713 (Ala. Civ. App. 2001).

The former husband specifically argues that he was not properly notified of the charges against him because the former wife's initial petition alleged that the former husband had failed to make payments in only the months of January, April, July, August, September, October,

15

November, and December 2023 and was later amended to include an allegation that he had also failed to pay alimony between January 2024 and April 2024. The record does not reflect that the former husband objected to the introduction of evidence regarding past-due alimony payments from 2021 or 2022.[10] Further, the former husband presented evidence and testimony regarding his attempts at making alimony payments during those years and presented in his testimony reasons that his failure to pay should be excused. Thus, the trial court could have concluded that the issue regarding the former husband's alleged failure to pay certain alimony payments in 2021 and 2022 was tried by the implied consent of the parties. See Rule 15(b), Ala. R. Civ. P. (stating that, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if

_____

[10]The former husband's attorney stated on the record her belief that the parties had previously tried the issue of certain of the past-due payments from 2021 and 2022 at a trial held before the 2024 trial. The trial court observed that the last order regarding the former husband's alimony obligation had been entered in August 2019. The former husband's attorney did not object to the former wife's presentation of evidence regarding past-due alimony payments for months in 2021 and 2022 that were not enumerated in her petition after the trial court made its observation.

16

they had been raised in the pleadings"), and <u>Young v. Corrigan</u>, 253 So. 3d 373, 379 (Ala. Civ. App. 2017) (quoting <u>S.A.M. v. M.H.W.</u>, 227 So. 3d 1232 (Ala. Civ. App. 2017) ("When an issue is 'raised at trial without objection, ... it [is] tried by the implied consent of the parties.'")).[11]

The former husband also argues that the evidence presented at trial does not support the trial court's judgment finding him in constructive criminal contempt. Rule 70A(a)(2)(C)(ii), Ala. R. Civ. P., defines "criminal contempt" as including the "[w]illful disobedience or resistance of any person to a court's lawful writ, subpoena, process, order, rule, or command, where the dominant purpose of the finding of contempt is to punish the contemnor." The trial court found that the former husband willfully failed to comply with the June and August 2019 arrearage orders.

---

[11]We note that the former husband objected to the introduction of evidence concerning the 2019 arrearage amount, which was also not included in the former wife's contempt petition. However, the trial court's contempt order found the former husband in contempt for past-due alimony payments that came due in unspecified months in 2021 and 2022 and in the enumerated months in 2023 and 2024. Further, the trial court appears to have considered the 2019 arrearage amount only with respect to the amount that the trial court found the former husband owed to the former wife in its August 2024 order, which, as discussed above, is not a final judgment which would support this appeal.

Our standard of review in this matter is well settled.

"Unlike civil contempt, criminal contempt requires proof beyond a reasonable doubt of the alleged contemnor's guilt. See Ex parte Ferguson, 819 So. 2d 626, 629 (Ala. 2001).

"'[T]he standard of review in an appeal from an adjudication of criminal contempt occurring in a civil case is whether the offense, i.e., the contempt, was proved beyond a reasonable doubt. Hicks v. Feiock, 485 U.S. 624, 108 S. Ct. 1423, 99 L. Ed. 2d 721 (1988); Combs v. Ryan's Coal Co., 785 F.2d 970 (11th Cir. 1986); and United States v. Turner, 812 F.2d 1552 (11th Cir. 1987) …. In Turner, the Court, in discussing the standard of review in a criminal-contempt case, said:

"'"The essential elements of the criminal contempt for which punishment has been imposed on [the defendant] are that the court entered a lawful order of reasonable specificity, [the defendant] violated it, and the violation was wilful. Guilt may be determined and punishment imposed only if each of these elements has been proved beyond a reasonable doubt."

"'Turner, 812 F.2d at 1563.'"

Kizale v. Kizale, 254 So. 3d 233, 237-38 (Ala. Civ. App. 2017) (footnote omitted) (quoting Ex parte Ferguson, 819 So. 2d 626, 629 (Ala. 2001)).

Additionally,

"The issue whether to hold a party in contempt is solely within the discretion of the trial court, and a trial court's

18

contempt determination will not be reversed on appeal absent a showing that the trial court acted outside its discretion or that its judgment is not supported by the evidence."

Poh v. Poh, 64 So. 3d 49, 61 (Ala. Civ. App. 2010). Further,

"'[w]hen a trial court receives ore tenus evidence, its judgment based on that evidence is afforded a presumption of correctness on appeal and will not be reversed absent a showing that the trial court exceeded its discretion or that the judgment is so unsupported by the evidence as to be plainly and palpably wrong.'"

Shook v. Shook, 385 So. 3d 65, 80 (Ala. Civ. App. 2023) (quoting Mullis v. Mullis, 994 So. 2d 934, 936-37 (Ala. Civ. App. 2007)). However, we review issues of law de novo. Barber v. Moore, 897 So. 2d 1150, 1153 (Ala. Civ. App. 2004).

In his brief on appeal, the former husband appears to acknowledge, as he did at trial, that he did not make the alimony payments alleged in the former wife's petition for contempt, as amended. Instead, the former husband argues that, because he was unemployed between November 2021 and April 2024, he lacked the ability to pay his alimony. Although the former husband fails to cite any relevant authority to support this argument, we note that "'[t]he inability to pay child-support or alimony is a defense to contempt.'" Rivera v. Sanchez, 297 So. 3d 1242, 1253 (Ala. Civ. App. 2019) (quoting Watts v. Watts, 706 So. 2d 749, 751 (Ala. Civ.

19

App. 1997)). "When the accused presents evidence that he is unable to pay the ordered amount, the burden o[f] proof is on the complainant to prove beyond a reasonable doubt that he can comply." Watts v. Watts, 706 So. 2d 749, 751 (Ala. Civ. App. 1997). In support of his argument that he did not have the ability to pay his alimony, the former husband contends that the trial court could not consider his VA benefits in its determination of his ability to pay. In making this argument, he relies exclusively on Ex parte Billeck, 777 So. 2d 105 (Ala. 2000), which he asserts stands for the premise that VA disability benefits may not be considered as income for periodic-alimony payments.

In Ex parte Billeck, our supreme court, applying Mansell v. Mansell, 490 U.S. 581 (1989), held that a trial court could not consider a military retiree's VA disability benefits received in lieu of military retirement pay in the division of marital assets or in making an award of periodic alimony. However, in this case, the former husband testified that he had served approximately nine years in the military and, thus, was not eligible for military retirement. In Nelms v. Nelms, 99 So. 3d 1228 (Ala. Civ. App. 2012), this court determined that the holding in Ex parte Billeck did not apply to cases in which the VA disability benefits at

20

issue were not received in lieu of military-retirement benefits. Instead, relying on the United States Supreme Court's decision in Rose v. Rose, 481 U.S. 619 (1987), we held that "a spouse whose income includes VA disability benefits can be ordered to pay periodic alimony, even when all or a portion of the alimony necessarily will be paid from those benefits." Nelms, 99 So. 3d at 1232. We recently applied Nelms in Turney v. Turney, 381 So. 3d 429 (Ala. Civ. App. 2022), a case in which the appellant argued that the trial court had exceeded its discretion in considering his VA disability benefits as available income in its determination of his ability to pay a periodic-alimony award. This court held that "the trial court did not err in considering the [appellant's] VA disability benefits when determining [his] ability to pay $2,500 in periodic alimony." Id. at 450. It follows that, if a trial court can consider VA disability benefits in determining the amount of an alimony award, it may also similarly consider those benefits in determining whether a former spouse who is alleged to be in contempt for failing to make alimony payments had the ability to pay his or her alimony obligation. Accordingly, the trial court properly considered the former husband's VA benefits in determining his ability to make his alimony payments.

21

In its judgment finding the former husband in criminal contempt, the trial court determined that the former husband had willfully failed to make six alimony payments in 2021, five alimony payments in 2022, eight alimony payments in 2023, and three alimony payments in 2024. Thus, the trial court must have concluded that the former husband had the ability to pay alimony at the time that each alimony payment had come due. In the June and August 2019 arrearage orders, the trial court directed the former husband to continue paying $400 per month in periodic alimony and to pay an additional $500 per month until the 2019 arrearage amount was paid in full.[12] Thus, the former husband was required to pay $900 per month until the 2019 arrearage amount was extinguished, at which time he would be responsible for paying only the $400 per month in periodic alimony. The trial court recognized that the former husband was already subject to a $461 per month income-withholding order, and it directed that that order be continued and ordered the former husband to make up the difference between the $900 due and the $461 being withheld by paying the former wife two

[12]As noted above, there is no reference in the June and August 2019 arrearage orders concerning the amount of interest owed on the 2019 arrearage amount.

installments of $219.50 per month. Based on the June and August 2019 arrearage orders, it appears that the trial court considered $400 of the $461 being withheld as satisfying the former husband's monthly alimony obligation and the remaining $61, along with the two monthly installment payments of $219.50, to comprise the $500 payment directed toward the 2019 arrearage amount.

The former wife alleged at trial that the former husband still owed $3,210.28 of the 2019 arrearage amount. However, she failed to introduce any evidence supporting this assertion. In contrast, the former husband presented evidence indicating that he had made payments pursuant to the June and August 2019 arrearage orders until July 2020, when he stopped making the $219.50 installment payments.[13] However, he permitted the $461 withholding order to continue in effect until November 2021. The former husband introduced evidence indicating that the income-withholding order had resulted in the former wife's

_____

[13]Based on the record, the former husband made his required $400 monthly alimony payment and his $500 monthly payment toward the 2019 arrearage amount between September 2019 and July 2020. Thus, it appears the former husband paid a total of $10,159.25 to the former wife between September 2019 and July 2020.

receipt of 24 alimony payments of $230.77 in 2021, or 12 payments of approximately $461 in 2021.[14] Therefore, the trial court could not have found beyond a reasonable doubt that the former husband had failed to make six alimony payments in 2021. Accordingly, we reverse the trial court's judgment insofar as it finds the former husband guilty of criminal contempt for missing six months of alimony payments in 2021.

In the section of his brief arguing that he had lacked the ability to make his alimony payments from November 2021 to March 2024, the former husband expressly states that he made certain alimony payments from September 2019 to November 2021. While the former husband is not as clear as we might prefer on this issue, the fact remains that he asserted in his brief on appeal that he made his alimony payments between January 2021 and November 2021. Put differently, implicit in the former husband's argument that he failed to make his alimony payments after November 2021 because he lacked the ability to make those payments is an assertion that he had had the ability to make his

---

[14]The record reflects that the former wife received three payments of $230.77 pursuant to the income-withholding order in January 2021 and July 2021. Therefore, the former husband had satisfied his December 2021 obligation by November 2021.

alimony payments between January 2021 and November 2021 and that he had done so. Accordingly, we have elected to exercise our discretion to address the former husband's implicit assertion that, although he had paid amounts totaling 12 monthly alimony payments during 2021, the trial court erred by finding him in contempt for nonpayment for 6 of those months. See Kirksey v. Roberts, 613 So. 2d 352 (Ala. 1993); Hernandez v. Rodriguez, 402 So. 3d 255, 259 (Ala. Civ. App. 2024).

With respect to the missed payments in 2023 and 2024, the former husband conceded at trial that he had not made the payments asserted by the former wife in her contempt motion, as amended. Additionally, the former husband's own evidence supports the conclusion that he made only seven alimony payments in 2022. The former husband's sole argument is that he did not have the ability to pay alimony between 2022 and April 2024 because he was unemployed and receiving only VA benefits. As discussed above, the trial court could have considered the former husband's VA benefits in determining whether he had had the ability to pay his monthly alimony obligation. Although the former husband did not present evidence of the amount of his VA benefit in 2022 or 2023, he testified at the June 2024 trial date that his benefit had

25

"recently" increased to approximately $3,566 per month and that the VA had found him to be 100% disabled as of June 2020.

We also note that there is little evidence regarding the former husband's expenditures during the time that he was alleged to have failed to pay his alimony obligation; such evidence might have established his inability to pay alimony. The former husband testified that, as of the date of the trial, he owed $4,000 on his automobile loan, but the record contains no evidence regarding his monthly payment on that automobile loan. The current wife testified that the former husband paid approximately $2,700 per month toward the mortgage on their new home; however, that home was acquired in May 2023, approximately one year before the trial. Therefore, the former husband has failed to establish that he lacked the ability to pay his alimony between 2022 and April 2024, and the trial court could have found beyond a reasonable doubt that the former husband had willfully failed to make his alimony payments for five months in 2022, eight months in 2023, and three months in 2024. Accordingly, we affirm the trial court's August 2024 order with respect to those instances of contempt.

The former husband argues that his $5,000 payment to the former wife between the two dates of trial purged him of his contempt because, he says, the trial court "order[ed]/encourage[d]" him to pay the former wife after the April 2024 trial date and suggested that, if he did so, he would not be held in contempt. Although the record reflects that, at the April 2024 trial date, the trial court encouraged the former husband to make a payment to the former wife, the trial court did not specify an amount that should be paid, did not set forth its request in a written order, or explicitly provide that the outcome of the proceeding would be impacted if the former husband did make a payment. At the June 2024 trial date, in response to the former husband's attorney stating that the trial court had ordered the former husband to pay the former wife, the trial court clarified on the record that it had "encouraged" the former husband to make a payment and indicated that the former wife's claim for past-due alimony would be reduced by the $5,000 that he had paid to the former wife. Additionally, to the extent that the former husband argues that the $5,000 payment purged him of each count of contempt despite his failing to pay the full principal amount of the arrearage, he offers no authority to support his argument. See Rule 28(a)(10), Ala. R.

27

App. P. (requiring that an appellant support the arguments presented in his or her brief on appeal with citations to appropriate legal authority).

The former husband also argues that the 110-day jail sentence imposed by the trial court was excessive. The former husband asserts that he did not willfully violate the trial court's order requiring him to make alimony payments to the former wife. He argues that "[f]ailing to make a payment required under a court order isn't contemptuous. Failing to make an alimony payment is a financial decision and not an affront to a court, or court order." Upon finding the former husband in criminal contempt, the trial court was authorized by Rule 70A(e)(1), Ala. R. Civ. P., and Ala. Code 1975, § 12-11-30(5), to punish the former husband with a sentence of imprisonment not exceeding five days for each count of contempt. See Rasmussen v. Rasmussen, 380 So. 3d 1048 (Ala. Civ. App. 2023) (affirming a contempt judgment imposing a sentence of 45 days of incarceration for 9 counts of contempt). Therefore, a 110-day jail sentence would be permissible if the former husband were in fact guilty of 22 counts of criminal contempt. However, for the reasons set forth above, the trial court had sufficient evidence to find the former husband in criminal contempt only with respect to a total of 16 missed

28

alimony payments. Therefore, we reverse the August 2024 order insofar as it sentences the former husband to 110 days in jail and remand the case to the trial court to recalculate the former husband's sentence pursuant to the authority granted to the trial court in Rule 70A(e)(1) and § 12-11-30(5).

Based on the foregoing, we reject the former husband's arguments that the trial court's August 2024 contempt order is tainted by bias and that the trial court's denial of his counterclaim was in error because the former husband has failed to preserve those issues for appellate review. We reverse that portion of the trial court's August 2024 judgment finding the former husband in criminal contempt for failing to make six alimony payments in 2021. We affirm the trial court's August 2024 judgment with respect to the contempt findings relating to the former husband's failure to make certain alimony payments in 2022, 2023, and 2024. We also reverse the August 2024 judgment insofar as the trial court imposed a sentence of 110 days in jail, and we remand the case for the trial court to recalculate the former husband's sentence in light of this opinion.

APPLICATION OVERRULED; OPINION OF MAY 23, 2025, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Hanson, Fridy, and Bowden, JJ., concur.